No. 104,495

In the Matter of of PATRICK S. BISHOP, *Respondent.*

(240 P.3d 956)

Opinion filed October 15, 2010.

*Alexander M. Walczak*, deputy disciplinary administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with him on the formal complaint for the petitioner.

*Patrick S. Bishop*, respondent, argued the cause pro se.

*Per Curiam:* This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Patrick S. Bishop, of Fort Scott, Kansas, an attorney admitted to the practice of law in Kansas in 1979. On March 28, 2008, the respondent's license to practice law was indefinitely suspended by the Supreme Court.

On July 15, 2009, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed an answer to the formal complaint on September 27, 2009. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on October 1, 2009, where the respondent was personally present. The hearing panel determined that respondent violated KRPC 1.1 (2009 Kan. Ct. R. Annot. 410) (competence); 1.3 (2009 Kan. Ct. R. Annot. 426) (diligence); 1.4(a) (2009 Kan. Ct. R. Annot. 443) (communication); 8.4(c) (2009 Kan. Ct. R. Annot. 602) (engaging in conduct involving misrepresentation); and Kansas Supreme Court Rule 211(b) (2009 Kan. Ct. R. Annot. 321) (failure to file answer in disciplinary proceeding). Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

### "FINDINGS OF FACT

"2. Sometime prior to October, 2005, Frank and Laura Peterson retained the Respondent to file a Chapter 7, no asset, bankruptcy in their behalf. Initially, Mrs. Peterson provided the Respondent a list of creditors on a yellow piece of paper.

"3.    Later, but prior to the bankruptcy being filed, Mrs. Peterson realized that she had omitted a creditor from the list, Frisbie Chiropractic. Mrs. Peterson contacted the Respondent and orally informed him of the additional creditor. [Footnote: At the hearing on this matter, Mrs. Peterson's testimony and the Respondent's testimony conflicted. Based upon all the evidence presented to the Hearing Panel, including the demeanor of the witnesses, the Hearing Panel has concluded that Mrs. Peterson's testimony is credible while the Respondent's testimony lacks credibility.] Mrs. Peterson informed the Respondent that Frisbie Chiropractic is located in Oswego, Kansas. Mrs. Peterson offered to provide the Respondent with the address of the creditor, however, the Respondent informed her that that would not be necessary, that he would locate the address himself.

"4.    Beginning September 1, 2004, the United States Bankruptcy Court for the District of Kansas required all filings to be done electronically. In order to be eligible to file bankruptcy cases electronically, an attorney was required to complete training, obtain a user name, and a password. The Respondent never became eligible to file bankruptcy cases electronically. As a result, the Respondent was not eligible to file Mr. and Mrs. Peterson's bankruptcy case.

"5.    Erik Klutman of Klutman & Weeks was eligible to file bankruptcy cases electronically. The Respondent made an agreement with attorney Mr. Klutman, whereby Mr. Klutman agreed to file bankruptcy cases electronically in behalf of the Respondent. Specifically, Mr. Klutman agreed to file the bankruptcy case in behalf of Mr. and Mrs. Peterson.

"6.    The Respondent drafted the bankruptcy pleadings with the information that Mr. and Mrs. Peterson provided. However, the Respondent failed to include Frisbie Chiropractic as a creditor. The Respondent provided the draft, along with some notes, to Mr. Klutman.

"7.    Significant changes in the bankruptcy law went into effect October 17, 2005. As a result, the Respondent directed Mr. Klutman to file Mr. and Mrs. Peterson's bankruptcy on October 16, 2005.

"8.    Mr. Klutman electronically filed Mr. and Mrs. Peterson's bankruptcy on October 16, 2005. The petition did not include Frisbie Chiropractic as a creditor.

"9.    On February 9, 2006, the Court discharged Mr. and Mrs. Peterson's debts in bankruptcy. However, the bankruptcy case remained open at that time.

"10.    On August 7, 2006, Michael Hassenplug filed suit against Mrs. Peterson in behalf of Frisbie Chiropractic, Labette County District Court, case number 06LM398PA.

"11.    Mrs. Peterson was properly served with a summons in the case on August 15, 2006. Thereafter, Mrs. Peterson forwarded the summons to the Respondent seeking assistance, as she believed that this debt had been discharged in bankruptcy.

"12.    On September 7, 2006, the Respondent filed an answer to the Petition. In the answer, the Respondent asserted the affirmative defense that the debt was discharged in bankruptcy.

"13. At the time the Respondent filed the Answer, he did not believe that Mrs. Peterson had a valid defense to the suit. The Respondent clearly stated his position in his response to the initial complaint filed by Mrs. Peterson:

'. . . Thus I believed that there was no defense to the petition. If I thought there was a defense I would have had to explain to Ms. Peterson that the cost of defending the same would have been greater than the underlying claim, particularly since the lawsuit was filed in Labette County, Kansas, some 60 miles from where I worked.'

During the disciplinary investigation, the Respondent submitted to a sworn statement. During his sworn statement, the Respondent testified that the reason he alleged the affirmative defense in the Answer was because he thought that the claim might 'go away.'

'Q. . . . At that time you raised the defense of discharge of bankruptcy?

'A. Correct. Uh-huh.

'Q. What did you do to try to advance that defense on behalf of Ms. Peterson?

'A. I'm not sure I could have done anything. It was not discharged in bankruptcy, so—

'Q. Okay. Did you—when you became aware of this lawsuit—

A. To be perfectly—

'Q. Go ahead.

'A. To be perfectly honest, if I raised that, might just go away. . . .'

"14. After Mr. Hassenplug received the Respondent's answer, Mr. Hassenplug attempted to verify that Frisbie Chiropractic had been included as a creditor in Mrs. Peterson's bankruptcy. When Mr. Hassenplug checked, he learned that Frisbie Chiropractic had not been included in the bankruptcy filings.

"15. Mr. Hassenplug contacted the Respondent and informed him that Frisbie Chiropractic had not been included as a creditor in Mrs. Peterson's bankruptcy. At that time, without authority from his client, the Respondent agreed to confess judgment in behalf of Mrs. Peterson.

"16. Mrs. Peterson's bankruptcy case remained open. Despite that fact, the Respondent did not attempt to amend the list of creditors in Mrs. Peterson['s bankruptcy]. Additionally, the Respondent conducted no research into whether an unlisted creditor could be added as a creditor following discharge but before a bankruptcy case was closed, in a no asset case.

'17. The Labette County District Court scheduled Frisbie Chiropractic case for a case management conference on October 25, 2006. Prior to the scheduled conference, Mr. Hassenplug notified the Court that the case had settled and that a journal entry would be submitted.

"18. On October 30, 2006, Mr. Hassenplug wrote to the Respondent and enclosed a proposed journal entry.

"19. However, the journal entry was not submitted to the Court. Thereafter, in December, 2006, the Clerk of the District Court notified the parties that the case would be dismissed for a lack of prosecution. On January 17, 2007, the Court dismissed the action.

"20.   On February 23, 2007, Mr. Hassenplug filed a motion for reinstatement, asserting that the Respondent had neglected to sign and return the journal entry of judgment as promised.

"21.   On February 28, 2007, the United States Bankruptcy Court for the District of Kansas closed, or terminated, Mr. and Mrs. Peterson's bankruptcy case.

"22.   In March, 2007, the Respondent signed and returned the journal entry of judgment confessing judgment in behalf of Mrs. Peterson. The Respondent did not have authority to enter the journal entry in behalf of Mrs. Peterson.

"23.   On March 30, 2007, the Labette County District Court granted the plaintiff's motion for reinstatement of the Frisbie Chiropractic case and, based on the agreed entry of judgment signed by the Respondent, entered judgment against Mrs. Peterson.

"24.   Thereafter, Mr. Hassenplug began collection proceedings against Mrs. Peterson.

"25.   On August 7, 2007, after receiving a garnishment notice, Mrs. Peterson wrote to the Respondent requesting his assistance with resolving the collection of the judgment of Frisbie Chiropractic. The Respondent did not respond to Mrs. Peterson's letter.

"26.   On September 26, 2007, Mrs. Peterson again wrote to the Respondent seeking his assistance. Again, the Respondent failed to respond to Mrs. Peterson's letter.

"27.   On November 7, 2007, Mrs. Peterson wrote to the Respondent for a third time. Again, the Respondent did not respond to Mrs. Peterson's request for assistance.

"28.   On March 28, 2008, the Kansas Supreme Court indefinitely suspended the Respondent from the practice of law.

"29.   On May 22, 2008, Mrs. Peterson wrote the Honorable Robert J. Fleming regarding this matter. Judge Fleming forwarded her letter to the Disciplinary Administrator.

"30.   Throughout the period of representation of Mrs. Peterson in the Frisbie Chiropractic suit, Mrs. Peterson telephoned the Respondent on many occasions. Each time, Mrs. Peterson left a message for the Respondent to return the call. The Respondent did not return Mrs. Peterson's calls.

"31.   After being notified of the complaint received by the Disciplinary Administrator, the Respondent provided a written response.

"32.   Thereafter, on July 15, 2009, the Disciplinary Administrator filed a Formal Complaint. The Respondent did not file an Answer to the Formal Complaint until September 29, 2009, two days before the hearing on the Formal Complaint.

## "CONCLUSIONS OF LAW

"1.   Based upon the findings of fact, the Hearing Panel concludes as a matter of law that the Respondent violated KRPC 1.1, KRPC 1.3, KRPC 1.4, KRPC 8.4, and Kan. Sup. Ct. R. 211, as detailed below.

"2.   Lawyers must provide competent representation to their clients. KRPC 1.1. 'Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.' The Respondent failed to provide Mrs. Peterson competent representation when he failed to amend her list of creditors to include Frisbie Chiropractic. The Respondent learned of the suit in August, 2006, when Mrs. Peterson forwarded a copy of the summons to the Respondent. At that time, Mr. and Mrs. Peterson's bankruptcy case remained open.

"3.   According to Local Bankruptcy Rule 1009.1, a debtor may amend the list of creditors by serving an amendment to the schedule on the United States trustee. The Respondent either did not know about Local Bankruptcy Rule 1009.1 or interpreted that rule to mean that a debtor may amend the list of creditors only prior to discharge. However, the rule does not restrict amendments to a time prior to discharge. According to Darcy Williamson, a bankruptcy practitioner and a bankruptcy trustee, Local Bankruptcy Rule 1009.1 would have permitted the Respondent to amend Mr. and Mrs. Peterson's bankruptcy schedules to include Frisbie Chiropractic as a creditor.

"4.   Additionally, case law existed for the Respondent to argue that the Frisbie Chiropractic debt was discharged even without notice because Mr. and Mrs. Peterson's bankruptcy was a no asset bankruptcy. *In re Caldwell*, Case No. 98-40285-7.

"5.   By failing to seek to have the Frisbie Chiropractic debt discharged, the Respondent failed to provide Mr. and Mrs. Peterson with competent and thorough representation. Because the Respondent failed to provide Mr. and Mrs. Peterson competent and thorough representation, the Hearing Panel concludes that the Respondent violated KRPC 1.1.

"6.   Attorneys must act with reasonable diligence and promptness in representing their clients. *See* KRPC 1.3. The Respondent failed to diligently and promptly represent Mrs. Peterson in the Frisbie Chiropractic suit. The Respondent should have taken appropriate steps to have the debt discharged in bankruptcy. Instead of providing diligent representation to Mrs. Peterson, the Respondent did nothing. Because the Respondent failed to act with reasonable diligence and promptness in representing his client, the Hearing Panel concludes that the Respondent violated KRPC 1.3.

"7.   KRPC 1.4(a) provides that '[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.' In this case, the Respondent violated KRPC 1.4(a) when he failed to return Mrs. Peterson's telephone calls when he failed to respond to her written correspondence and when he allowed judgment to be taken against her without her knowledge. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 1.4(a).

"8.   'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The Respondent engaged in conduct that involved dishonesty when he filed the Answer in the Frisbie Chiropractic case. He alleged that the debt had been discharged

when he believed that it had not been. He made the allegation to see if it would 'go away.' As such, the Hearing Panel concludes that the Respondent violated KRPC 8.4(c).

"9. The Kansas Supreme Court Rules require attorneys to file Answers to Formal Complaints. Kan. Sup. Ct. R. 211(b) provides the requirements:

'The Respondent shall serve an answer upon the Disciplinary Administrator within twenty days after the service of the complaint unless such time is extended by the Disciplinary Administrator or the hearing panel.'

In this case, the Respondent violated Kan. Sup. Ct. R. 211(b) by failing to file a timely written Answer to the Formal Complaint. Accordingly, the Hearing Panel concludes that the Respondent violated Kan. Sup. Ct. R. 211(b).

## "AMERICAN BAR ASSOCIATION
## STANDARDS FOR IMPOSING LAWYER SANCTIONS

"In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated*. The Respondent violated his duty to his client to provide competent and diligent representation and adequate communication. The Respondent violated his duty to the public and legal profession to maintain his personal integrity. Finally, the Respondent violated his duty to the legal profession to comply with the Rules of the Kansas Supreme Court.

"*Mental State*. The Respondent knowingly violated his duties.

"*Injury*. As a result of the Respondent's misconduct, the Respondent caused actual injury to Mrs. Peterson.

"*Aggravating or Mitigating Factors*. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"*Prior Disciplinary Offenses*. The Respondent has previously been disciplined.

"On April 14, 2004, the Respondent entered into a Diversion Agreement with the Disciplinary Administrator's Office for having violated KRPC 1.1, KRPC 1.2, KRPC 1.3, and KRPC 1.4. Pursuant to Kan. Sup. Ct. R. 203(d)(2)(vi), the Respondent's prior participation in the Attorney Diversion Program is to be considered as prior discipline.

"On March 28, 2008, the Kansas Supreme Court indefinitely suspended the Respondent from the practice of law for having violated KRPC 1.1, KRPC 1.3, KRPC 1.4, KRPC 3.2, KRPC 8.1(b), KRPC 8.4(c), KRPC 8.4(d), and Kan. Sup. Ct. R. 207(b).

"*Dishonest or Selfish Motive*. The Respondent was not honest in the answer he filed on behalf of Mrs. Peterson in the Frisbie Chiropractic case. Additionally, the

Respondent provided false testimony in his sworn statement to Mr. Kluin and to the Hearing Panel during the hearing on this matter. Accordingly, the Hearing Panel concludes that the Respondent's misconduct was motivated by dishonesty or selfishness.

"*A Pattern of Misconduct.* The Respondent engaged in misconduct since March, 1999, and continuing through 2007. The pattern of misconduct includes two separate types of misconduct. First, from 1999, through 2007, the Respondent failed to provide competent representation, diligent representation, and adequate communication to his clients. Second, the Respondent provided misleading testimony in the disciplinary proceedings in 2007 and again in this case. Accordingly, the Hearing Panel concludes that the Respondent has engaged in a pattern of misconduct. In this case, the conclusion that the Respondent has engaged in a pattern of misconduct is a significant aggravating factor.

"*Multiple Offenses.* The Respondent engaged in multiple offenses by violating KRPC 1.1, KRPC 1.3, KRPC 1.4, KRPC 8.4, and Kan. Sup. Ct. R. 211.

"*Bad Faith Obstruction of the Disciplinary Proceeding by Intentionally Failing to Comply with Rules or Orders of the Disciplinary Process.* The Respondent engaged in bad faith obstruction of the disciplinary proceeding by failing to provide an Answer to the Formal Complaint until two days before the scheduled hearing. The Respondent's failure in this regard is exacerbated by the fact that the Respondent participated in a disciplinary hearing two years earlier.

"*Submission of False Evidence, False Statements, or Other Deceptive Practices During the Disciplinary Process.* The Respondent submitted false evidence, made false statements, and engaged in deceptive practices during the disciplinary investigation and during hearing on the Formal Complaint.

"First, during the Respondent's sworn statement taken by Mr. Kluin, the Respondent testified as follows:

'Q.    You're indicating that Laura provided you with the name of Frisbie Chiropractic Clinic but didn't provide you with an address?

'A.    She didn't even know what town he was in. I—why I remember that, I couldn't believe it.

'Q.    Did you look in the phone book to see if you could find an address?

'A.    Yeah, I did. Still don't know the address.

'Q.    What else did you do to try to locate an address for Frisbie Chiropractic?

'A.    Told her to get her — I always explain to my clients — there's one other piece of correspondence that I don't have. And I'm sure, whenever I had a client talk to me about a bankruptcy, I gave them a letter and forms to hand-fill out . Very explicit in that letter, if you don't list them by name and address you don't get discharged. I mean, she got that letter. I know that she did.

'Always kept—I always kept—what I did all those years, is I basically copied the petition. And then just ha[ve] them fill it in. And I always kept those things. Obviously, Mr. Klutman didn't. But she was aware of the facts. She had to

provide me with that information or she necessarily wouldn't be granted discharge.

'Q. My question was—

'A. Okay.

'Q. But my question wasn't that.

'A. Yeah.

'Q. I'm not asking about whether or not she knew that or not. I assume you told her that?

'A. Yes. Absolutely.

'Q. My question was, you've had a client who tells you, I've got a Frisbie Chiropractic debt but I don't know where the person's located. My question was, what did you do to try to find the address—

'A. I got on the Internet. Looked in the phone book.

. . . .

'Q. My question: What did you do to try to locate an address for Frisbie Chiropractic?

'A. Probably got out the Craw-Kan phone book. And maybe got on the Internet. Other than that, I doubt I did anything. I know I told Laura more than once I needed the address.'

"Conversely, at the hearing on the Formal Complaint, the Respondent testified as follows:

'Oh, Mr. Kluin inquired as to whether I tried to track down Frisbee Chiropractic. And — and yeah, I mean, I did on a — on a very limited basis. He said all I did is look in he [sic] Fort Scott phonebook, that's not true. I looked in the — and it's not a big thing, but I looked in what's call [sic] the Craw Kan phonebook, which is a regional phonebook. I didn't see Frisbee [sic] Chiropractic in - in the phonebooks that I had available. I didn't find it on the internet [sic]. I will admit I didn't think to go to the Secretary of State's website or anything like that. I did not find Frisbee [sic] Chiropractic back in October — or any point in time prior to — prior — prior to October of 2006 because I didn't have a reason to look for it. Again, the client never broached that subject again.

'I probably — I'll be honest with you, I probably had that bankruptcy petition for the better part of a year before it was filed. And I — frankly, if — if Frisbee [sic] Chiropractic was out there, I never gave it a second thought so that I would have no reason to get on the internet [sic] to — to — I mean, my — my looking for Frisbee [sic] Chiropractic was after, you know, you know, I got the — I got the petition, that kind of thing. I didn't even look then obviously because it was right in front of me. But the fact of the matter is, I had no reason to look for Frisbee [sic] Chiropractic at any point in time prior to October of — of 2006.'

"Mrs. Peterson knew what town Frisbie Chiropractic was located in. The car accident which lead to Mrs. Peterson's need for chiropractic services occurred in Oswego, Kansas. Mrs. Peterson went to Frisbie Chiropractic for chiropractic serv-

ices in Oswego, Kansas, on at least six occasions. At the time, Mrs. Peterson worked in Oswego, Kansas. The Respondent's testimony that Mrs. Peterson did not know where Frisbie Chiropractic is clearly false.

"Additionally, the Respondent's testimony regarding what measures he took to locate Frisbie Chiropractic is also clearly false. At the sworn statement, he testified that when Mrs. Peterson did not provide it, he attempted to locate it. At the hearing on this matter, he testified that he had no need to find Frisbie Chiropractic's address until after the suit was filed. He would have had no need to find their address in conjunction with the filing of the lawsuit. He would have needed to find the address in preparation for the filing of the bankruptcy. Accordingly, the Hearing Panel concludes that the Respondent testified falsely during the disciplinary process.

"The conclusion that the Respondent submitted false statements during the disciplinary process is consistent with the opinion of the Kansas Supreme Court in the Respondent's previous disciplinary case:

'Regarding whether there was a completed QDRO, in his brief to the court Bishop explains he sent a proposed QDRO to the plan administrator, and the plan administrator rejected the proposed order. Bishop states he prepared a "modified one that would have undoubtedly been accepted if submitted, which it was not." He implies that having modified the QDRO he had 'completed' the QDRO. This assertion is contrary to other explanations Bishop gave regarding the QDRO. In his August 2005, letter to the Fletchers, after explaining there would be no trial in the personal injury action, Bishop stated: "I have sent another QDRO to Ennis Business Forms so hopefully Diana's matter will finally be resolved." A different explanation is found in Bishop's answer to the supplement to the formal complaint in which he stated that after the first QDRO was rejected by the plan administrator he "did not prepare a corrected QDRO that would have been approved by the plan administrator." Nevertheless, even if we accept that he corrected the QDRO, we cannot accept Bishop's argument that this was a "completed" QDRO. His argument ignores reality and the potential harm Bishop's lack of action could have had; a draft QDRO tucked away in a file did nothing to protect Mrs. Fletcher's interest in her ex-husband's stock and pension plan. There is considerable evidence that Mrs. Fletcher had to consult with another attorney in order to obtain a valid, "completed" QDRO.' [285 Kan. at 1107.]

"*Refusal to Acknowledge Wrongful Nature of Conduct.* At the hearing on this matter, the Respondent admitted that he failed to timely file an Answer. However, the Respondent denied that his actions violated any other rules of professional conduct. As a result, the Hearing Panel concludes that the Respondent refused to acknowledge the wrongful nature of his conduct.

"*Vulnerability of Victim.* Mr. and Mrs. Peterson are individuals of limited financial means and as such were vulnerable to the Respondent's misconduct.

"*Substantial Experience in the Practice of Law.* The Respondent was a licensed Kansas attorney from April 20, 1979, to March 28, 2008. As such, the Hearing

Panel concludes that the Respondent had substantial experience in the practice of law.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"*Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney.* The Hearing Panel received three character letters from the Respondent's colleagues, Gilbert E. Gregory, Charles Gentry, and Gayla Mason.

"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:

'4.41    Disbarment is generally appropriate when:

. . . .

(b) a lawyer knowingly fails to perform services for a client and causes serious or potentially serious injury to a client; . . . .

'4.51    Disbarment is generally appropriate when a lawyer's course of conduct demonstrates that the lawyer does not understand the most fundamental legal doctrines or procedures, and the lawyer's conduct causes injury or potential injury to a client.

'7.1    Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.

'8.1    Disbarment is generally appropriate when a lawyer:

. . . .

(b) has been suspended for the same or similar misconduct, and intentionally or knowingly engages in further acts of misconduct that cause injury or potential injury to a client, the public, the legal system, or the profession.'

## "RECOMMENDATION

"The Disciplinary Administrator recommended that the Respondent be disbarred. The Respondent recommends that the Hearing Panel find that he violated only Kan. Sup. Ct. R. 211(b) and that the remaining violations be dismissed. Additionally, the Respondent recommended he be censured or that he be further suspended. Finally, the Respondent requested that he not be disbarred.

"The Respondent is currently suspended from the practice of law for an indefinite period of time. Pursuant to Kan. Sup. Ct. R. 219(i), the Respondent would be eligible to apply for reinstatement on March 28, 2011.

"Based upon the findings of fact, conclusions of law, and the Standards listed above, the Hearing Panel unanimously recommends that the Respondent be disbarred.

"Costs are assessed against the Respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009); see Supreme Court Rule 211(f) (2009 Kan. Ct. R. Annot. 337). Clear and convincing evidence is " 'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable." ' " 288 Kan. at 505 (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]). The evidence before the hearing panel establishes the charged misconduct of the respondent by clear and convincing evidence and supports the panel's conclusions of law. In addition, respondent elected not to file any exceptions to the hearing panel's final hearing report. As such, the findings of fact are deemed admitted. Supreme Court Rule 212(d) (2009 Kan. Ct. R. Annot. 337). We therefore adopt the panel's findings and conclusions.

## CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that PATRICK S. BISHOP be disbarred from the practice of law in the state of Kansas, effective on filing of this opinion, in accordance with Supreme Court Rule 203(a)(1) (2009 Kan. Ct. R. Annot. 272).

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 218 (2009 Kan. Ct. R. Annot. 361), and in the event the respondent would seek reinstatement, he shall comply with Supreme Court Rule 219 (2009 Kan. Ct. R. Annot. 376).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.

PATRICIA MACKE DICK, District Judge, assigned.